Good morning, Your Honor, and may it please the Court, I'm Robert Clarida, representing the appellants. I'm sorry I mispronounced your name, Mr. Clarida. Beg your pardon? I'm sorry I mispronounced your name. I put the accent on myself. Everybody, that's all right. Thank you, Your Honor. And this is a statutory interpretation case. As our briefing explains in detail, if the plain language of the relevant statutes is correctly applied as written, the District Court's ruling should be reversed. The District Court made two fundamental errors of statutory interpretation. First, the court below erroneously held, contrary to the plain language of the 1976 Copyright Act and all existing case law, the statutory termination of a copyright grant under Section 304C affects ownership of rights in the work worldwide, not just in the U.S. No court had ever previously so held. Second, the court below erroneously held, contrary to the plain language of the reversion of a deceased author's renewal rights in a work also causes reversion of rights in the work outside the U.S. where there is no renewal right. No court had ever previously so held. These errors of statutory interpretation were founded on Mr. Vedder's novel theory that all worldwide copyright protection flows from a single unitary copyright determined by the law of the having the closest relationship to the work. This is not just wrong, it is the exact opposite of the universally accepted principle that copyright is territorial and arises separately under the laws of each nation. What is your strongest case for that? On territoriality, Your Honor? On the statement you just made. This court's decision in the Geophysical Services case says U.S. copyright law has no application outside the borders of this country. Therefore, the district court's position would violate the principle of national treatment under the Berne Convention and the Universal Copyright Convention to which the U.S. has a signatory. The U.S. has an obligation to give authors from foreign countries no less protection than it gives to U.S. authors and the district court's ruling would place the U.S. in violation of those obligations. Therefore, this court should hold as the statute and the precedent demand that copyright and the work in foreign territories arises under the laws of those foreign territories. And that correct premise will then compel two inevitable conclusions. First, that termination under Section 304 C of the 1976 Act has no extraterritorial effect. And second, that recapture of the renewal term rights of a deceased author under the 1909 Act has no extraterritorial effect. I can briefly review the facts. They're uncontested. They're set forth in the complaint. In 1962, Cyril Vedder and his friend Don Smith wrote a song called Double Shot of My Baby's Love. In 1963, they assigned all the worldwide rights in the song to an entity called Windsong, which is the predecessor in interest of the appellants. In 1972, while the work was still in its initial copyright term, Mr. Smith died. In 1996, Mr. Vedder's company, Vedder Communications Corp., acquired the rights of Mr. Smith's heirs, that's the Smith interest. In 2019, Mr. Vedder served a termination notice under the 1976 Act, 17 U.S.C. 304 C, terminating the 1963 assignment. Mr. Resnick's counsel, upon receiving the termination notice, communicated to Mr. Vedder's counsel, saying that under U.S. copyright law, termination of the transfer only terminates the transfer in the United States. The parties obviously disagreed about that. Litigation commenced with the filing of the complaint on September 27th, 2023. The ruling presented for review is the district court's January 29th, 2025 order, granting summary judgment to Mr. Vedder and the judgment that was entered that same day. Unless the court has questions at this point, I'd like to begin by addressing the issue arising out of the 1976 copyright act. Why was the district court wrong in finding extracurritorial application of the termination right under Section 304, the language of the statute? Section 304 C6E specifically says that termination under Section 304 affects only those rights covered by the grant that arise under this title, that is the Copyright Act, and in no way affects arising under any other federal, state, or foreign laws. That means what it says. As the Supreme Court has said, our task is to apply the statutory text, not to improve upon it. The statutory language in Section 304 C could not be clearer. And we don't have to guess about how it applies to the present facts because the legislative history squarely addresses that. The 1965 Supplementary Report, Register of Copyrights, that was part of the process by which the 1976 Copyright Act was drafted, explained specifically that this foreign laws language that's in 304 C6E ensures that termination affects only those rights arising from the Copyright Act and, quote, has no effect, for example, on foreign rights that are covered by the same contract, end quote. That is exactly the factual situation here. The language has been unchanged since 1965 when that report was issued. The District Court effectively rewrote the statute to make it say the opposite of what Congress, in fact, provided. And in addition to Section 304 C6E, which has the specific geographical restriction, the first clause of Section 304 C, which creates the termination notice, makes clear that only U.S. rights are affected because it only permits termination of, quote, a grant of a transfer or license of the renewal copyright or any right under it, end quote. Only the U.S. has a renewal copyright. And Mr. Vetter has not disputed that in this case. Only that renewal copyright is subject to termination under Section 304 C. So the termination right is, by statutory definition, geographically limited by the language. Also, the plain language of Section 24 of the 1909 Act also strongly supports this geographical limitation. We discussed that issue in our briefs. I don't need to get into it here other than to say that under the 1909 Act, the court was clearly talking about creating a renewal term of a U.S. copyright, a term of 28 years. Only the U.S. had a 28-year term. And that could be filing, quote, in the copyright office, meaning the United States Copyright Office. So the 28-year renewal and extension that was created under the 1909 Act was explicitly geographic in nature. And it still is today. And that is what Section 304 is referencing when it says the grant of rights of renewal rights can be terminated under Section 304 C. So given the clear statutory language, it's not surprising that every other court that has addressed this question has found no extraterritorial effect for statutory termination. And you have Professor Nimmer on your side. We certainly do have Professor Nimmer. Even though he acknowledges that there's some dispute about that. Well, Professor Nimmer, having looked at the cases and come to a conclusion, squarely comes down in favor of saying there is no geographic limitation. The Siegel case refers and relies very heavily on Professor Nimmer, as other courts have done. And the Siegel case involved copyright in Superman, comic book character. And it finds that the statutory language could not be clearer. It says the contrary ruling would not only contradict the plain terms of the statute, but also violate the longstanding rule that the copyright laws of this country have no application beyond the U.S. orders. There's six amicus briefs filed in this case. Four of them favor the better position, the other two yours, Nimmer's. So obviously it's not as straightforward as you push it. The four are pretty animated, I should just say. They are, they are. I would agree with that characterization. In terms of the view that, you know, that they take and as mentioned, Professor Nimmer hedges a little bit. But at any event. In any event, your honor, let me just speak to those amicus briefs because certainly the policy behind the determination right was to allow authors to get a second bite at the apple. The question is, what's the apple? And the appellee side wants to have the biggest apple possible. They want to be able to recapture everything all over the world immediately by anybody. But that's not the statute that Congress wrote. Congress enacted a compromise. It created a statutory termination right, but it also put limits on that right. And the geographical scope of termination is one of those limits. It also doesn't allow termination of works made for hire. It also doesn't allow termination of existing derivative works. It doesn't allow termination by persons who are not the statutory successors listed in the copyright act. How do you respond to the argument that Congress knows how to put geographical limitations in a law when it wants to? And it has in other contexts, like the Lanham Act and the Patent Act. And it didn't do that here. Well, Congress attempted to do that here. If the language is not as clear as it could have been, it says the termination does not affect rights arising under foreign law. And that clearly has some geographical significance. But doesn't it also say federal and state? That's true. And those are other limitations on the termination right. It doesn't affect rights arising under the Lanham Act, for example, Your Honor just mentioned. Doesn't affect rights arising under the Patent Act, which is another federal law. Doesn't affect rights arising under state trademark laws or state unfair competition laws or anything of that nature. It just affects rights arising under the U.S. Copyright Act and not foreign copyright acts. And that's the language arising under foreign laws. That's what that's designed to reach. And that's exactly what the legislative history says. If there is a grant that encompasses both U.S. rights and foreign rights, only the U.S. rights are terminated, even if they're conveyed in the same grant. And I think that's why the language in that second clause is really important, because the district court seemed to be of the opinion that if the grant is terminated, every aspect of the grant must be terminated, all of it. And if it conveyed worldwide rights, then worldwide rights must be terminated. Well, can a copyright under the Copyright Act grant worldwide rights? No. Each country grants a copyright within its own territory. The U.S. Congress cannot grant an author copyrights in France or Japan or anywhere else. U.S. Congress can grant copyrights to authors in the United States. And the French legislature and the Japanese legislature can do that within their territories. So Congress really could not say to other countries of the world, you must grant copyright to these authors for these works because the U.S. tells you to. There's no mechanism by which the U.S. can do that. Well, doesn't the Berne Convention basically say, you're going to treat it the way we do? And if Congress allows an author in the United States to have a worldwide copyright, doesn't the convention mean that the other countries have to respect that? No, because the convention actually, the Berne Convention Article 5, Section 1, says the principle is territoriality. Each country in its own domestic laws shall provide for copyright rights up to a certain standard that the Berne Convention provides. And then Article 5, Section 2 of Berne says, and within that country, the country shall treat authors from other Berne countries no less favorably than it treats its own authors. It doesn't say that courts of France can impose their will on U.S. copyright. Or conversely, that the U.S. Congress, in creating copyright law in this country, can impose its will on other countries. And to the extent there was ever any doubt about that, and there has never been in a reported case, the Berne Convention, specifically when the U.S. acceded to the Berne Convention in 1988, we agreed that we would abide by those principles, territoriality and national treatment. And the district court's decision would place the U.S. in violation of both of those principles. And, of course, as we talk about in our brief, under the Charmy Betsy doctrine, statutory interpretation should not infringe on the rights of the political branches, the legislature and the executive branch, to enter into agreements with foreign nations and engage in foreign relations. And that's what this would do. It would say, well, now the U.S., we're not in compliance with Berne. We're not in compliance with the Universal Copyright Convention anymore. And it would create chaos. It would literally upend what is now 60 years of understanding of the way the Copyright Act works. Since 1965, there's been no question in anybody's mind that termination rights that were eventually created in the 1976 Act do not affect foreign rights. And now we have a case that has upended all those settled expectations. And it will make it really difficult, if not impossible, for anyone to exploit these works outside the United States. Because courts in France, Japan, wherever they may be, are not obliged to follow a U.S. court's determination about who's the owner of copyright in their countries. That's the law of those countries. And Mr. Vetter relies a lot on the Etart-Tass case, which involved Soviet-era news articles. The question in that case was a U.S. infringement case. The question was, who can enforce those copyrights in the United States? And in that case, it arose under U.S. law. It's a U.S. copyright infringement case. The Second Circuit applied U.S. choice of law principles to say, in that case, we think Russian law should determine initial ownership. But that case arose under U.S. law, and the rights that were vindicated in that case were U.S. rights. And that's the way the Etart-Tass case relates to all of this. It's a choice of law case. It's not a case about statutory interpretation. And conversely, if a case were brought in France or Japan, the courts of those countries would apply their own choice of law analysis to determine what they thought the fair result should be. But that doesn't mean that there is a global copyright that other countries of the world are bound to interpret in the same way the U.S. interprets it within our borders. And if I may, just for a second, touch on the 1909 Act issue, which has to do with the reversion of renewal term rights under the 1909 Act. And basically, the background is, under the 1909 Act, there was a 28-year original term and a 28-year renewal. So your initial time has expired, and you had only saved yourself three minutes anyway. So I would advise you to go ahead and wait for your rebuttal. I'll revisit this. Thank you. Thank you. Mr. Capo? Good morning, Your Honors. Thank you for the opportunity of oral argument in this case, and may it please the Court. Since our nation's first copyright act, Congress has sought to guarantee authors the ability to recapture copyrights previously transferred away. As noted on multiple occasions by the Supreme Court, Congress intended to relieve authors like Don Smith and Cyril Vedder of the consequences of their prior transfers and to return control of the copyright to them. The geographically limited version of recapture rights envisioned by my friends on the other side does not. To the contrary, Resnick's position reflects an untenable view that despite Congress's intent, authors can never fully regain control of their works and are forever burdened by the consequences of their prior transfer. The District Court rightly rejected this distorted reality, and the judgment should be affirmed for three reasons. First, when Don Smith died before the renewal term of copyright commenced, his heirs received an entirely new property estate, nothing in Section 24 of the 1909 Act limits that estate geographically, and the Supreme Court was clear in Stewart when it said that the renewal right is free and clear of all claims premised upon the prior assignment. Second, upon exercising his termination rights, Cyril Vedder recaptured all copyrights in the double-shot work that he transferred away in 1963 for a dollar. The Supreme Court's decision in Kurtzank confirms that a, quote, owner of copyright under this title has no geographic limitation. Post-termination, Vedder is indisputably the owner of copyright under this title, and so the termination provisions of the Act cannot be used to create second-class ownership of a copyright. Third, the district court judgment is neither impermissibly extraterritorial, nor is it in violation of any of our treaty obligations. I simply put, this case is about an American copyright transferred to an American publisher whose American successor and interest now seeks to deny the works American authors the true promise of rights guaranteed by the United States Congress. Now, I'll begin with the renewal rights obtained by Mr. Smith's heirs. My friends on the other side don't focus on the renewal rights very much because the right to obtain a renewal copyright is absolutely unrestricted in the 1909 Act. And the Supreme Court has been equally unequivocal that a renewal copyright cuts off all rights obtained under the initial assignment of the work. Now, Resnick's only explanation for this silence is the assumption that his multiplicity of copyright theory is so universal and so accepted that neither members of Congress nor the Supreme Court would bother to tell us how this elephant got in the mousetrap. Now, it doesn't matter how many times I say if there is no universal consensus on this multiplicity theory, you won't find a statutory or a case citation that supports it. And in fact, in order to push this theory in this case, Resnick has to duck all evidence to the contrary. For example, as Judge Ramirez, you pointed out the Lanham Act and the Patent Act expressly provide for territorially distinct intellectual property assets that stop at the U.S. border. But as this court held in geophysical services or filed the geophysical services, the Copyright Act doesn't express its territorial reach. Additionally, this court's decision in Canadian standards, it assumed a copyright property interest held in Canada by its owner who was seeking enforcement of the Canadian copyright in the United States. Never once did this court suggest that what was at issue in that case was a quote, U.S. copyright in the Canadian word. And surely the court wouldn't have characterized that as being held in Canada. Now, Resnick's use of academic commentary is contrary to I. Tartas and his progeny, which treats copyright as a singular property asset, the ownership and essential nature of which must be determined in accordance with the laws of the country with the closest relationship to the work. Well, here, the only country with any relationship to the work is the United States. So using that commentary, that academic commentary as a vehicle to import geography into a statute and into Supreme Court decisions that say nothing about it is wrong on its face, but it's particularly egregious when it's used to slice up my client's recapture rights into 181 different pieces so that he can retain 180. Now, with alternative termination rights, which those can't be viewed in a vacuum, right? They are the spiritual and statutory successor to the renewal rights provided by the United States Congress in 1789. The rights provided in 304C are inalienable and silent as to geography. I heard my friend on the other side make an argument that because 304C references the quote, renewal copyright, that that is an inherent geographic limitation. The problem with that, of course, is section 203, which is identical, doesn't reference the renewal copyright. It just references the copyright, a transfer of the copyright. And the reason for that is simple. Section 203 deals with works that are protected under unitary term and section 304C protects or applies to works that are protected under the renewal regime. So unless my friends on the other side are arguing that there's somehow a geographic distinction between terminations on 304C and terminations under 203, they don't take that to be their position. That argument simply doesn't hold much weight. What we're really talking about here is the exception to the broader realm. And that is in section 304C-60 and 203B-5. That, as my friends point out, states that termination only affects rights that quote, arise under this title and doesn't affect rights quote, arising under other federal state and foreign laws. Now, as noted by the Supreme Court, and this court in matter of grande, under is something of a community and it's context dependent, which provides the path to the competing interpretations that we have before us today. So what it means to say under this title and under other federal and state and foreign laws, Resnick's interpretation was rejected by the district court for the same reason it should be rejected on this appeal. It's overbroad. It frustrates the purpose of the provisions and it leads to absurd results. Beginning with the rights that arise under this title. My friends rely on the district court opinion and Siegel v. Warner Brothers. In that case, the district court assumed that the phrase arise or under this title meant the rights identified in Title 17 of the US Code. But Kurtz saying dispenses with that notion. Kurtz saying by finding that copies of a textbook that were made in Thailand under the foreign copyright laws were nevertheless lawfully created under this title means that under this title has no inherent geographic limitation. Now, of course, that case involved the first sale provisions. This case involves the termination provisions of the 1976 Act. But the fact that under this title has no inherent geographic limitation means that Siegel's underlying assumption was wrong. Now, as for the word arise, there is no dispute that one definition of that word is to originate from a source. So Chief Judge Dick was perfectly within reason to find that rights that arise under this title simply mean that copyright ownership that originated in the United States by meeting the requirements of the copyright act. And there's nothing novel about this. Again, Kurtz saying says that the phrase copyright owner under this title as used in Section 106 of the Act has no geographic limitation. Post termination, better is the owner of copyright under this title. And so the attempt to impose a geographic restriction where the Supreme Court says there is none, is contrary to Kurtz's. So as Judge Stewart pointed out, there is, of course, scholarly dispute about this question. So you need to address what those respectable authorities have said to the contrary. Absolutely, Judge Bennett. And look, we, as someone who teaches law a few miles down the street, I have absolute respect for academics and the work that they do. But frankly, this is not a law school exam. This is an Article III controversy. And the only people that are entitled to decide what this statute means are the three of you sitting on this bench. And so if you look at what Professors Patry and Nemer may have said on this issue, it's not very well supported, not very well developed. And it principally relies on some of the same things that my friends rely upon, that 1965 Supplemental Report, which I'll turn to momentarily. But with the understanding that rights that arise under this title has no geographic limitation, we can see what rights are rising under other federal, state, or foreign laws. That comes into full focus. This phrase is not best understood as distinguishing between fictitious, domestic, and foreign copyrights. Rather, it distinguishes between the copyright assignment and the grant and all other rights and obligations regardless of their source. So for example, a requirement to arbitrate disputes arises under the Federal Arbitration Act, unaffected. Confidentiality requirements, accounting obligations, limitations upon the ability to audit royalty statements, all arise under state law, unaffected. Moral rights. Moral rights are recognized in foreign territories and oftentimes in contracts, authors are required to waive any claim to moral rights. We don't have moral rights in this country. Those arise under foreign law and so a waiver of moral rights also would qualify as one of those federal laws that are unaffected. Or for that matter, the entire contract could be governed by federal or some foreign law and that would be foreign contract law. Again, those things remain unaffected. Now we stipulate that there are multiple ways that this can be read in the abstract but our interpretation is better for a few reasons. First, it's consistent with what the Supreme Court has told us it means to be an owner under copyright and what the Supreme Court has told us the objective of termination rights was Congress intended to give authors control of the work. Every right that was transferred away under copyright comes back. There's no dispute as to who owns what and where. Second, our interpretation is appropriately narrow. As this court noted in Alabama Custom Tape, an exception to a broader right in the Copyright Act should be viewed narrowly so that the exception doesn't swallow the rule but that's exactly what happens here because under his interpretation, the termination of the grant, the exception to it, carves out 180 pieces of that and says, well, you get one. You get one country, I keep 180. So this is literally the exception swallowing the rule. Third, our interpretation avoids the absurd results that are inherent in Resnick's retention of control. For example, Resnick's interpretation renders meaningless the statutory prohibition identified in 304C6A and 203B1 which prevent the creation of new derivative works post termination. Resnick could create as many derivative works as he so chooses so long as he says they're created under the quote foreign copyrights and not the quote U.S. copyright. That simply can't be what Congress intended. Additionally, it allows him to block all exploitations of double shot that cannot be strictly limited to the United States. Counsel opposite ended his argument somewhat saying that the district court's interpretation in effect, my words, creates a parade of horribles. The law's been stable since 1965 and taking the view of spouse below now opens a big gate and creates enormous palpitations, et cetera. That's not the way he argued it. Just sort of the way I received, in other words, his arguments, the law is 1965, it's stable. The district court deviates from that and the interpretation of your client leads to consequences that are untenable in terms of disturbing copyright law, et cetera, et cetera, et cetera. So as I said, I didn't state it as eloquently as he did, but I think that's the gap. So what's your response to the quote parade of horribles? Sure. Let me address that in a couple of ways, Judge Stewart. First, the law has not been stable since 1965. The law wasn't passed until 1976. And that's important because the supplemental report that's relied upon by my friends on the other side was drafted in 1965 and essentially ended debate on termination rights such that there's no evidence whatsoever of what Congress intended the general termination rights to mean. And in fact, as we pointed out in our latest 28J letter, it's inconsistent with what the successor register of copyrights told Congress in 1975, the effect of termination was immediately right before they voted on the bill. So we can take that 1965 report in turn, but I wanted to at least clarify that. With respect to how this is disrupted, there is not a string of cases. There are a handful of district court cases that have addressed this before, and they all arise within the last 20 or so years. And what's at issue there is that this practice that has been engaged in by the industries, it doesn't matter how long they practice it if it was based on the wrong interpretation of the law. If it was wrong today, it was wrong in 1976. And even Kurtzsang noted that they were disrupting 30 years of understanding of how the first sale provision developed. And in that case, you had competing courts of appeals decisions on how that worked. But for the most part, the Supreme Court took the minority view and disrupted those practices. As to the parade of horribles, it reminds me a lot of the amicus briefs that were filed in Quality King and in Kurtzsang by some of the amicus supporting my friends on the other side. You see the exact same parade of horribles that were listed there. And as I stand here today, the sky is yet to fall. So I would encourage the court to view those, take those with a grain of salt. I've yet to hear exactly how this chaos is going to be created. All I keep hearing is that this will create chaos. There is no settled law on this matter. And in fact, we've got four amicus briefs on our side that support that. This is not the clean cut, clear distinction. And obviously Chief Judge Dick didn't buy that argument on. So what I would say is the last thing that I think the absurd result that is probably the most egregious is the fact that Reza could actually sue Vetter for infringing his own work if his use of double shot happens to stray from the strict geographic confines of the United States. That does not return control. That does not relieve burdens. Those burdens remain intact and the control remains outside of Vetter's hands if this interpretation is sustained. Now, none of this textual analysis was done in Siegel. And frankly, my friends on the other side haven't really engaged with it either. Instead, they very quickly turned to the 1965 supplemental report that was issued by then registered copyrights Abraham Comenstein. Now, that ruling or that report wasn't raised at the district court level, but it's been rejected on appeal for a few reasons. First, it is not an expression of congressional intent nor approval. The chairman of the committee states as much in the forward of the committee press. Second, in addition to the traditional concerns surrounding reliance on legislative history, the Supreme Court has told us that there's a particular danger in relying upon legislative history when it comes to termination rights. As I pointed out earlier, debate essentially ended 10 years prior to the bill being enacted. And as Stewart noted and the Supreme Court noted in Stewart, again, there's no real evidence as to what Congress intended that to mean. And on this exception, we find no evidence whatsoever. As far as we can tell, either before 1965 or after, this issue or geographic limitation on termination rights was never discussed, much less debated by Congress. The fact is, the statement in 1965 is isolated, unexplained, and contradictory to what the successor register of copyrights told Congress in 1975. But at the end of the day, authors should be allowed to rely on the law as written. And without the regard to these extra-textual considerations, and if you take the interpretive principles that this court used in the matter of Durand Day, when presented with two reasonable interpretations, the interpretation that accomplishes rather than frustrates the goal of the statute is undoubtedly the correct one. Resnick's approach was the consequences of the transfer in tact and the control of the work outside of the author's hands. That cannot be what Congress intended. Lastly, with respect to the statutory revision, as I understand it, this report was in 65, but in the late 60s and early 70s, Congress was continually being bombarded with requests to revise the copyright law, right? I mean, that was undercut. It wasn't like everything just quit in 65 and then was renewed in 75 or 76, that's my recollection from studying copyright in law school. You're absolutely right, Judge Smith, except that on this provision, the termination provisions, the debate ended. So all of the issues that were handled between 1965 and 1975 had nothing to do with these termination provisions. And the Supreme Court recognized that in Stewart that the debate ended in 1965. And so the idea that members of Congress in 1975 were paying attention to a supplementary report drafted 10 years earlier, I think it's a stretch. And so again, we look at what is the interpretation of the provision that accomplishes rather than frustrates the purpose. And I think that that's the correct one. One quick question. Sure. Does it make a difference or is there any significance to the fact that the assignment in this case expressly included all rights in the song throughout the entire world? Our position is that it does. Absolutely, because the assignment is what's being terminated. The assignment of copyright is what is being terminated through the termination provisions. And as Chief Judge did point it out, if the assignment of the right includes all rights to exploit that work throughout the world, then when you terminate that grant, what should come back is exactly what you gave away. That's what Congress intended. You gave away your copyright for a dollar in this case, you wait some time, 56 years in this case, and you get it back. And Your Honors, I would respectfully suggest that it is time. Cyril waited 60 years to get his rights back and Resnick's refusal to relinquish all rights in the work may reflect a popular industry practice, but that practice is built on a fundamental misunderstanding of the law and Congress could not have intended it. By affirming the district court's judgment, this court can ensure that authors receive the true promise of recapture rights that Congress intended. Thank you. Thank you, Mr. Pickle. Mr. Clarida, for both. Thank you, Your Honor. I'll just try to address a few of the points that were most egregiously off base. First of all, authors can't get 100% of their rights back and Congress said they can't get 100% of their rights back. It said they can't get rights back in works new for hire. It said they can't get rights back in existing derivative works. It said only certain people can get rights back. So the idea that somehow Congress wants this all encompassing, everything that can help the author is what that recapture right is designed to accomplish. That's just wrong. It was a compromise and I understand authors want to go back and renegotiate that compromise from 50 some years ago, but Congress has spoken on that. That is the compromise. On Kurtzing, it's surprising to me that Mr. Vedder keeps coming back to the Kurtzing case because the district court didn't rely on Kurtzing. The district court said it's inapposite. It's irrelevant. It's interpreting different statutory language. So the district court paid no attention whatsoever to Kurtzing. It was different statutory language and as we say in our reply brief, if you go back and look at it, it continuously goes back and says we have to look at the five word phrase, copies lawfully made under this title. It's the five word phrase lawfully made under this title that Kurtzing is interpreting and the term under Kurtzing says really doesn't have any inherent meaning. You have to look at it in the context of the entire statutory phrase. Also, the supreme court in Kurtzing relied on the very 1965 copyright registers report that Mr. Vedder says this court should disregard. It looked to the legislative history and said the 1965 report speaks exactly to it. Kurtzing also looked to the common law history of the first sale doctrine that was being statutorily codified in section 109. There is no common law history of the termination right. It's a creature of statute. It didn't exist before. So you apply the interpretive methodology that Kurtzing did, you get to a different result. So Kurtzing reaches a non-geographic result but if you apply that same reasoning to the facts of this case and the legislative language and statutory history of this case, you get the opposite result. As for the legislative history, nobody is saying that this is somehow a way to read the minds of the legislators. But the case that we talk about in our reply brief, McDonald against Chicago, Justice Thomas says that's not why we look at legislative history. We can look at it to see what the public at large thought those words meant at the time. And that's what it's being introduced for here. It's just to say that's what rights arising under foreign law means. And Mr. Vedder said, they stipulate that there are multiple ways to read it. Well, if there are multiple ways to read it, a legislative history can be very illuminating and clarifying that ambiguity. And finally, to pick up on Judge Ramirez's question, I understand I'm out of time, about the language of the assignment itself. Does it matter? This is at page 30 in the record. The assignment itself from 1963 understood and assumed that there are multiple copyrights. There's not one worldwide copyright. It says that the authors, Mr. Smith and Mr. Vedder, assigned to Winsong Music, all copyrights plural thereof, including copyright registration number such and such. Or nearly out of time means out of time. I'm sorry, Your Honor. I'll thank the court for its consideration. All right, the case is under submission. Last case for today.